**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TREY OSHAE STEVENSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-972 (RBW) |
| | ) |
| DISTRICT OF COLUMBIA, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

The plaintiff, Trey Oshae Stevenson, brings this civil action against the defendants, the

District of Columbia (the "District"); and unknown Metropolitan Police Department ("MPD")

employees (referred hereafter sometimes collectively as "the defendants"), alleging, pursuant to

42 U.S.C. § 1983, that his rights protected by the Fourth Amendment to the United States

Constitution were violated by the defendants.  See Amended Complaint ("Am. Compl.") ¶¶ 90–

99, ECF No. 11-1.[1]  Currently pending before the Court is the District of Columbia's motion for

summary judgment.  See The District of Columbia's Motion for Summary Judgment ("Def.'s

---

[1] The plaintiff also alleged violations of the Equal Protection Clause of the Fifth Amendment to the United States
Constitution against all of the defendants, pursuant to 42 U.S.C. § 1983.  See Am. Compl. ¶¶ 80–89.  However, on
February 28, 2020, the Court issued an order dismissing with prejudice "all of the plaintiff's claims against Chief
Newsham and the Federal Defendants[,]" Order at 2 (Feb. 28, 2020), ECF No. 34, who consist of "Donald
Washington, the Director of the United States Marshals Service[;] Michael A. Hughes, a former United States
Marshal for the Superior Court of the District of Columbia[;] and the unknown Marshals Service employees[,]" id.
at 1.  The Court also dismissed with prejudice all of the plaintiff's Fifth Amendment claims, given that the plaintiff
at the time represented that he would "only [be] pursuing Count II of his Amended Complaint[.]"  Id. at 2; see Am.
Compl. ¶¶ 80–89 (listing Count I as the plaintiff's Fifth Amendment claim).  Accordingly, the only remaining
claims are the plaintiff's Fourth Amendment claims against the District of Columbia and the unknown MPD
employees.

Mot." or the "defendant's motion"), ECF No. 60.[2]  Upon careful consideration of the parties'

submissions,[3] the Court concludes for the following reasons that it must grant in part and deny in

part the defendant's motion for summary judgment.

## I.      BACKGROUND

### A.      Factual Background

The plaintiff, Trey Oshae Stevenson, is a "transgender man, who was born female and

legally became male in 2012."  Def.'s Facts ¶ 1; see Pl.'s Facts at 1 ("For the purposes of

summary judgment, [the p]laintiff does not dispute Defendant's Statement of Material Facts [ ]

Nos. 1–9, 12–15, 17, 19–20, and 25–27.").  "[The plaintiff's] driver's license in August 2017[,]

stated that his gender was male."  Pl.'s Facts ¶ 28; see Def.'s Resp. to Pl.'s Facts ¶ 28.  On

August 9, 2017, the plaintiff "was arrested by an [MPD] [o]fficer for possessing an open

container of alcohol in his vehicle."  Def.'s Facts ¶ 2; see Pl.'s Facts at 1.  "[The plaintiff]

provided his driver's license to [the arresting officer,]" Pl.'s Facts ¶ 29; see Def.'s Resp. to Pl.'s

Facts ¶ 29, and was "taken to MPD's Sixth District station, where he was placed in a cell until he

was transported to [the Department of Corrections ('DOC')] Central Cellblock[,]" Def.'s Facts ¶

3; see Pl.'s Facts at 1.

---

[2] Although the defendant's motion is titled as only the District of Columbia's motion for summary judgment, see Def.'s Mot. at 1, it also seeks dismissal of the claims against the Unknown MPD Employees, see Def.'s Mem. at 26–28.

[3] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the District of Columbia's Memorandum in Support of Its Motion for Summary Judgment ("Def.'s Mem."), ECF No. 60-2; (2) the Defendant's Statement of Material Facts as to Which There Is No Genuine Dispute ("Def.'s Facts"), ECF No. 60-3; (3) the plaintiff's Opposition to Motion for Summary Judgment ("Pl.'s Opp'n"), ECF No. 64; (4) the Plaintiff's Response to Defendant's Statement of Material Facts and Statement of Facts Precluding Summary Judgment ("Pl.'s Facts"), ECF No. 64-1; (5) the District of Columbia's Reply Brief in Support of Its Motion for Summary Judgment ("Def.'s Reply"), ECF No. 68; and (6) the District of Columbia's Response to Plaintiff's Statement of Material Facts In Dispute ("Def.'s Resp. to Pl.'s Facts"), ECF No. 68-1.

While awaiting transport at the Sixth District station, "[the plaintiff] was fingerprinted[,]" Pl.'s Facts ¶ 30; see Def.'s Resp. to Pl.'s Facts ¶ 30, and the fingerprinting information was "processed through [the Automated Fingerprint Identification System (']AFIS['])], a federal fingerprint database[,which generates] . . . the arrestee's basic identifying information[,]" Pl.'s Facts ¶ 31; see Def.'s Resp. to Pl.'s Facts ¶ 31.  "[The plaintiff's] AFIS report listed his gender as female."  Pl.'s Facts ¶ 32; see Def.'s Resp. to Pl.'s Facts ¶ 32.  After the plaintiff was fingerprinted and processed, "[he was asked by an MPD officer if he was transgender, and [he] responded in the affirmative."  Pl.'s Facts ¶ 33; see Def.'s Resp. to Pl.'s Facts ¶ 33.  Later, "[the plaintiff] fell asleep[,]" Pl.'s Facts ¶ 34; see Def.'s Resp. to Pl.'s Facts ¶ 34, and "[a]t approximately 11 p.m. on August 9, 2017, . . . was awakened by an African American MPD officer to be transported[,]" Pl.'s Facts ¶ 35; see Def.'s Resp. to Pl.'s Facts ¶ 35.  The plaintiff claims that this officer was "retired MPD Officer Phillip Harris[.]"  Def.'s Facts ¶ 5; see Pl.'s Facts at 1; id. ¶ 36; but see Def.'s Resp. to Pl.'s Facts ¶ 36 (highlighting inconsistencies between the plaintiff's deposition testimony and interrogatory responses, as to his identification of Officer Harris).  "[The p]laintiff testified that he was searched[,]" Def.'s Facts ¶ 4; see Pl.'s Facts at 1, by Officer Harris, and acknowledged that "[n]either a 'strip,' 'squat,' or 'body cavity' search was employed on [the p]laintiff[,]" Def.'s Facts ¶ 7; see Pl.'s Facts at 1.  The plaintiff also testified that when Officer Harris searched the plaintiff, "[the plaintiff] asked him why [he] wasn't going home, and [Officer Harris] said, [']we still trying to figure out who you are.[']" Def.'s Facts ¶ 8 (quoting Def.'s Mot., Exhibit ("Ex.") 1 (Deposition of Trey Oshae Stevenson ("Pl.'s Dep.")) at 68:3–5, ECF No. 62-1); see Pl.'s Facts at 1.  Officer Harris then allegedly told the plaintiff, "[']as a matter of fact, get on the wall.[']"  Def.'s Facts ¶ 8 (quoting Def.'s Mot., Ex. 1 (Pl.'s Dep.)) at 68:3–5); see Pl.'s Facts at 1.

Specifically, the plaintiff testified during his deposition that, after Officer Harris directed him to "[g]et on the wall, he searched and [that it] started . . . like a routine frisk.  He started with [the plaintiff's] upper body and then went down to [his] bottom half, went between [his] thighs, and kept feeling up to [his] private area several times."  Def.'s Mot., Ex. 1 (Pl.'s Dep.) at 69:16–20.  Additionally, the plaintiff testified that Officer Harris "pulled [his] shorts and [his] underwear, like he pulled it out and was shaking it up and down."  Id. at 70:21–71:1.  In an attempt to clarify what the plaintiff was describing, the plaintiff was asked "I'm having trouble visualizing this.  He pulls the underwear and shorts out and shakes the underwear and shorts?," to which the plaintiff responded, "[y]es."  Id. at 71:2–5.  During this encounter, "[the plaintiff] was zip-tied to a male arrestee[,]" Pl.'s Facts ¶ 47; see Def.'s Resp. to Pl.'s Facts ¶ 47, who was not searched at that time, see Pl.'s Facts ¶ 48; but see Def.'s Resp. to Pl.'s Facts ¶ 48 (stating that the plaintiff is not competent to testify as to whether the other male arrestee was searched because "[the plaintiff] was not with the 'male arrestee' at any time prior to being brought from his cell").  "[The p]laintiff testified that neither Officer Lee, who was nearby, nor the searching transport officer, discussed either the search or [the plaintiff's] gender."  Def.'s Facts ¶ 9; see Pl.'s Facts at 1.  The plaintiff was subsequently "transported to Central Cellblock . . . and placed in DOC custody."  Def.'s Facts ¶ 17; see Pl.'s Facts at 1.

## B.    Procedural Background

On April 7, 2019, the plaintiff initiated this action, see Complaint ("Compl.") at 1, ECF No. 1, and filed his Amended Complaint on May 31, 2019, see Am. Compl. at 1.  After the Court dismissed all but the plaintiff's Fourth Amendment claims against the District of Columbia and the unknown MPD employees, on February 28, 2020, see Order at 2 (Feb. 28, 2020), ECF No. 34, the parties commenced discovery.  Discovery concluded on April 2, 2021, see Order at 1

(Feb. 25, 2021), ECF No. 55, and the District filed its motion for summary judgment on July 9, 2021, see Def.'s Mot. at 1.  The plaintiff filed his opposition on August 30, 2021, see Pl.'s Opp'n at 1, and the District filed its reply on September 21, 2021, see Def.'s Reply at 1.

## II.  STANDARD OF REVIEW

A court may grant a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."  Anderson, 477 U.S. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment[.]"  Id.  The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Accordingly, the non-moving party "must set forth specific facts showing that there [are] genuine issue[s] for trial."  Anderson,

477 U.S. at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving

party's] position . . . [is] insufficient" to withstand a motion for summary judgment; rather,

"there must be [some] evidence on which the jury could reasonably find for the [non-movant]."

Id. at 252.

### III.    ANALYSIS

The District first argues that it is entitled to summary judgment because "[the p]laintiff

has no evidence that his Fourth Amendment rights were violated."  Def.'s Mem. at 2.  Beyond

this threshold issue, the District makes further arguments regarding each of the defendants.  As

to the unknown MPD employees, the District argues that: (1) "even if [the p]laintiff had

identified the MPD transport officer[,] . . . the officer would be entitled to qualified immunity[,]"

id. at 10; and (2) "[the plaintiff's] claim against the 'unknown MPD employees' are subject to

dismissal" because "[the p]laintiff has never attempted to amend his Complaint to implead the

'unknown MPD officer' that he accuses of unconstitutionally searching him[,]" id. at 26.  As to

the District of Columbia, the District argues that the plaintiff "has no evidence that a District

'custom, policy, or practice' caused him to suffer a constitutional deprivation," sufficient to hold

these defendants liable.  Id. at 17.

In response, the plaintiff argues that "Officer Harris [g]roping [the plaintiff's] [v]agina to

[a]scertain his [a]natomical [g]ender is a [c]onstitutional [i]njury[,]" Pl.'s Opp'n at 5, and that

"any reasonable officer would have understood that groping [the plaintiff's] genitals . . . was a

violation of [his] constitutional rights[,]" id. at 7.  The plaintiff argues that the District of

Columbia should be held liable based upon the MPD's "failure to train its officers regarding its

policy on the treatment of transgender detainees[.]"  Id. at 11.  However, the plaintiff does not

address the District's argument that the plaintiff failed to properly implead the individual MPD

officer.  See generally id.

The Court will first consider the threshold issue of whether the plaintiff experienced an underlying Fourth Amendment violation.  Because the Court concludes that a reasonable jury could find that a constitutional deprivation occurred, see infra Section III.A, it will then address whether each of the defendants may be held liable by determining: (1) whether the claims against the Unknown MPD Employees are subject to dismissal based upon the plaintiff's failure to properly implead the searching officer as a defendant, and whether the individual Unknown MPD Employees are entitled to qualified immunity; and (2) whether the District of Columbia may be held liable for failure to train MPD employees regarding the treatment of transgender arrestees.

**A.       Whether the Plaintiff Experienced an Underlying Fourth Amendment Violation**

The Court first considers whether there are material facts in dispute which give rise to a violation of the plaintiff's rights under the Fourth Amendment.  The District argues that "[t]he [a]lleged [s]earch of [the p]laintiff did not [v]iolate the Fourth Amendment[,]" Def.'s Mem. at 4, and that therefore, "[b]ecause [the p]laintiff cannot establish a predicate constitutional violation, his [ ] claim [ ] must fail[,]" id. at 3.  The District characterizes the search of the plaintiff as "a quick search of a male transgender detainee by a male officer, with no verbal harassment[,]" id. at 7, which constituted a "routine contraband frisk[,]" id. at 6, that is "consistent with MPD's transgender search policy[,]" id.  The plaintiff, in response, characterizes the search not as a "routine frisk[,]" Pl.'s Opp'n at 5, but as a "grop[ing of the plaintiff]'s vagina two to four times for about five seconds each time[,]" id., which is "not 'entirely consistent with field search protocols' for transgender arrestees as claimed by [the District,]" id.

The Fourth Amendment prohibits "unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  Determining whether a search is "unreasonable" within the meaning of the Fourth

Amendment "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Bell v. Wolfish, 441 U.S. 520, 559 (1979). And therefore, "[c]ourts must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted." Id. Furthermore, "the balancing inquiry remains the same regardless of how one characterizes the search." BNSF Ry. Co. v. U.S. Dep't of Transp., 566 F.3d 200, 208 (D.C. Cir. 2009).

Regarding the scope and manner of the search, see Bell, 441 U.S. at 559, the parties dispute both the nature of the searching officer's physical contact with the plaintiff, as well as the time the officer took to complete the search. Namely, the District alleges that the officer conducted a "routine contraband frisk[,]" Def.'s Mem. at 6, "consistent with the field search protocol for transgender arrestees before transport[,]" id., while the plaintiff alleges that "Officer Harris groped [the plaintiff]'s vagina two to four times for about five seconds each time[,]" Pl.'s Opp'n at 5. The Supreme Court has "establishe[d] that a search of an arrestee will be a 'relatively extensive exploration of the person.'" Dickey v. United States, 174 F. Supp. 3d 366, 372 (D.D.C. 2016) (quoting United States v. Robinson, 414 U.S. 218, 227 (1973)). However, "[a] thorough search of the groin area[,]" Dickey, 174 F. Supp. 3d at 372, as condoned by the Supreme Court in Terry v. Ohio, 392 U.S. 1, 17 n.13 (1968), "is distinct from the fondling of genitalia[,]" Dickey, 174 F. Supp. 3d at 372. See id. at 371 (finding that an arresting officer "was surely entitled to pat [the plaintiff] down before taking him into custody[,]" but that "it is not clear . . . [that] searching [the plaintiff] a total of six times with two different sets of gloves was necessary or reasonable"). Moreover, "fondl[ing] [of genitalia] in such as way as to constitute 'sexual assault' . . . [is] and unreasonable search under the Fourth Amendment." Id.

Here, the search of the plaintiff was not a "cross-gender search[][,]" Shaw v. District of
Columbia, 944 F. Supp. 2d 43, 56 (D.D.C. 2013) (finding a physically intimate search of a
transgender woman by a male officer unreasonable); see Def.'s Facts ¶ 1 (stating that the
plaintiff is a "transgender man"); accord Pl.'s Facts ¶ 1, nor is the plaintiff explicitly alleging
"that his genitalia were fondled in such a way as to constitute a 'sexual assault[,]'" Dickey, 174
F. Supp. 3d at 371; see generally Pl.'s Facts.  However, the plaintiff does allege that "Officer
Harris touched [the plaintiff]'s vagina two to four times, [and that] therefore Officer Harris
touched [the plaintiff]'s vagina for up to twenty seconds."  Pl.'s Facts ¶ 14; but see Def.'s Facts ¶
14 (stating that "[the p]laintiff testified that th[e] frisk of his entire body took mere 'seconds'");
see also Pl.'s Opp'n, Ex. A (Plaintiff's Response to Defendant's First Set of Interrogatories to
Plaintiff ("Pl.'s Interrog. Resps.")) at 5, ECF No. 64-2 ("The [u]nknown MPD [o]fficer moved
his hand up [the p]laintiff's inner though and continued up, thereby touching [the p]laintiff's
vagina for about five seconds.  The [u]nknown MPD [o]fficer repeated this action of moving his
hands up [the p]laintiff's inner thigh and resting on [the p]laintiff's vagina one to three more
times.").[4]  Therefore, although the circumstances alleged by the plaintiff may not amount to an
"unusually intrusive" search, Dickey, 174 F. Supp. 3d at 370, "it is a close question[,]" Grissom
v. District of Columbia, 853 F. Supp. 2d 118, 125 (D.D.C. 2016), whether the alleged twenty
seconds of contact with the plaintiff's genitalia, which the plaintiff has characterized as
"groping," rises to the level of "repeated[] fondling [of the plaintiff's] genitals incident to [his]

---

[4] In response, the defendant points to discrepancies between the plaintiff's interrogatory responses and his
deposition testimony.  See Def.'s Mem. at 4 ("At his deposition, [the p]laintiff testified that the entire search took
'maybe five seconds.'" (quoting Def.'s Mot., Ex. 1 (Pl.'s Dep.") 71:19) (emphasis in original)).  However, the
plaintiff's opposition, response to interrogatories, and statement of facts, are all consistent as to the alleged amount
of time that elapsed during the search.  See Pl.'s Opp'n at 5 (stating that the officer felt the plaintiff's groin area
"three-to-five times for about five seconds each"); id., Ex. A (Pl.'s Interrog. Resps.) at 5 (same); Pl.'s Facts ¶ 14
(same).  Therefore, drawing "all justifiable inferences . . . in [the non-movant's] favor[,]" Anderson, 477 U.S. at
255, the Court finds these three statements are the appropriate characterizations of the plaintiff's allegations.

arrest[, which] would constitute a violation of that [plaintiff's] . . . constitutional rights[,]"
Dickey, 174 F. Supp. 3d at 371.  See id. (finding that six repeated instances of fondling the
plaintiff's genitals constituted an unreasonable search).  And, because "it is a close question[,] . .
. the Court cannot find as a matter of law that the search was reasonable."  Grissom, 853 F. Supp.
2d at 125.  Accordingly, drawing "all justifiable inferences . . . in [the non-movant's] favor[,]"
Anderson, 477 U.S. at 255, the Court concludes that the Bell factors to consider in evaluating the
scope and manner of the search weigh slightly in favor of unreasonableness.  And, therefore,
because there is a genuine dispute of material fact as to the temporal scope and nature of the
search, see Def.'s Facts ¶ 14; Pl.'s Facts ¶ 14, a reasonable jury could conclude that the scope
and manner of the search were unreasonable.

Regarding the justification for the search, see Bell, 441 U.S. at 559, the parties dispute
whether the search was conducted "for the purpose of determining [the plaintiff's] anatomical
gender[,]" Pl.'s Opp'n at 1, in direct contravention of MPD policy.[5]  See Def.'s Mem. at 4
("[The p]laintiff speculates that he was searched to determine his anatomical gender, but a search
was required before transport.");  see also Def.'s Mot., Ex. 2 (MPD General Order, Handling
Interactions with Transgender Individuals (Jan. 5, 2015) ("MPD General Order")) at 4, ECF No.
62-1 ("Under no circumstances shall members search any person solely for the purpose of
determining that person's gender." (emphasis in original)).  Specifically, the plaintiff alleges that,
after he was fingerprinted following his arrest and identified through the AFIS system as
"female," see Pl.'s Facts ¶¶ 30–32; accord Def.'s Resp. to Pl.'s Facts ¶¶ 30–32, the arresting
officer searched him to identify his anatomical gender, despite the plaintiff identifying himself as

---

[5] The defendant does not articulate a specific purpose for the search, beyond stating that "a search was required before transport."  Def.'s Mem. at 4.  The defendant "assumes the truth of [the p]laintiff's claims [that he was searched to determine his anatomical gender] for the purposes of [its] motion only[,]" and "[i]f the motion should be denied, the [defendant] withdraws this assumption and leaves [the p]laintiff to his proofs."  Id. at 3 n.1.

a transgender male to the officer, see Pl.'s Facts ¶ 33; accord Def.'s Resp. to Pl.'s Facts ¶ 33, and providing the officer with his driver's license, which identified him as "male," see Pl.'s Facts ¶¶ 28–29; accord Def.'s Resp. to Pl.'s Facts ¶¶ 28–29.

The plaintiff further alleges, and the District disputes, see Def.'s Resp. to Pl.'s Facts ¶¶ 37–39, that, immediately prior to his search, he "asked Officer Harris why he had not been released yet[,]" Pl.'s Facts ¶ 37, and "Officer Harris responded, 'We're trying to figure out who you are[,]'" id. ¶ 38, and "'[a]s a matter of fact, get on the wall[,]'" id. ¶ 39. This, the plaintiff argues, occurred despite the MPD's policies that "[u]nder no circumstances shall members search any person solely for the purpose of determining that person's gender[,]" Def.'s Mot., Ex. 2 (MPD General Order) at 4 (emphasis in original), and that "[a] person's driver's license is an acceptable form of proof of a person's gender[,]" Pl.'s Facts ¶ 58; accord Def.'s Resp. to Pl.'s Facts ¶ 58. Finally, the plaintiff alleges that he was "zip-tied to a[nother] male arrestee[,]" Pl.'s Facts ¶ 47; accord Def.'s Resp. to Pl.'s Facts ¶ 47, and "Officer Harris did not search the [other] male arrestee[,]" Pl.'s Facts ¶ 48; but see Def.'s Resp. to Pl.'s Facts ¶ 48 (stating that the plaintiff is not competent to attest to this alleged fact "because he was not with the 'male arrestee' at any time prior to being brought from his cell, and therefore could not know whether the 'male arrestee' was searched prior to transport").

"A detention facility is a unique place fraught with serious security dangers[,]" Bell, 441 U.S. at 559, and therefore, "[i]n the particular context of a detention facility, the question of reasonableness requires 'balancing the significant and legitimate security interests of the institution against the privacy interest of the [detainees,]'" Shaw, 944 F. Supp. 2d at 55 (quoting Bell, 441 U.S. at 560). Accordingly, "MPD policy requires a full-body pat[-]down search of all arrestees before transport." Def.'s Resp. to Pl.'s Facts ¶ 60 (citing Def.'s Mot., Ex. 2 (MPD

General Order) at 6 (requiring that officers must "[s]pecifically inform [a transgender] arrestee that the arrestee must, and will be, searched before being placed in a transport vehicle")). However, even in the context of a pre-transport search, the MPD's policy mandates that "[u]nder no circumstances shall members search any person solely for the purpose of determining that person's gender[,]" Def.'s Mot., Ex. 2 (MPD General Order) at 4 (emphasis in original). Additionally, MPD policies require that "[m]embers shall respect the gender identification or expression provided by any individual cited for a violation[,]" and "[w]here gender may be questionable or a hindrance to correct identification, members shall make an appropriate notation on [the relevant forms] and in their notebook." Id., Ex. 2 (MPD General Order) at 10. Thus, pursuant to MPD policy, a search conducted solely for purposes of determining a person's gender identity or anatomical gender violates MPD policy. See Pl.'s Facts ¶ 65; Def.'s Resp. to Pl.'s Facts ¶ 65.

Here, the District assumes for the purposes of its summary judgment motion that the search was conducted for the purpose of determining the plaintiff's anatomical gender. See Def.'s Mem. at 3 n.1. Additionally, although the officer did not expressly state that he was searching the plaintiff for the purpose of determining his anatomical gender, a jury could reasonably conclude based on the record evidence that the purported justification for the search—namely, that it was a routine pre-transport search, see Def.'s Mem. at 4—is contradicted by certain facts, some of which are in dispute. These alleged disputed facts include: (1) the officer's comments regarding "trying to figure out [the plaintiff's identity,]" Pl.'s Facts ¶ 38; but see Def.'s Resp. to Pl.'s Facts ¶ 38; (2) the plaintiff having previously provided the officer with his driver's license and identifying himself as a transgender male, see Pl.'s Facts ¶¶ 28–29, 33; accord Def.'s Resp. to Pl.'s Facts ¶¶ 28–29, 33; and (3) the difference in treatment regarding the

completion of a pre-transport search of the plaintiff versus the male arrestee to whom he was zip-tied during his search, see Pl.'s Facts ¶ 48; but see Def.'s Resp. to Pl.'s Facts ¶ 48. If proven, these facts could lead a jury to reasonably conclude that the officer searched the plaintiff to determine his anatomical gender and therefore that the search was unreasonable, given the MPD's policy against this type of search, see Def.'s Mot., Ex. 2 (MPD General Order) at 4. Therefore, the Court concludes that the Bell factor regarding the justification for initiating the search weighs in favor of finding the search unreasonable.

Finally, regarding the place where the search was conducted, see Bell, 441 U.S. at 559, the plaintiff has conceded that "the only facially reasonable aspect of the search was the place that it was conducted – [the] central cell block." Pl.'s Opp'n at 6–7. Thus, in light of the plaintiff's concession, and recognizing that "[a] detention facility is a unique place fraught with serious security dangers[,]" Bell, 441 U.S. at 559, the Court concludes that this factor weighs in favor of finding the search reasonable. Accordingly, in "balancing [ ] the need for the particular search against the invasion of personal rights that the search entails[,]" id., the Court concludes that three out of the four Bell factors weigh in favor of finding the search of the plaintiff unreasonable under the meaning of the Fourth Amendment. Therefore, the Court concludes that a reasonable jury could find in favor of the plaintiff. Having reached this conclusion, the Court now turns to considering whether each of the defendants may be held liable for this violation.

**B.     Whether the "Unknown MPD Employees" May Be Held Liable**

The Court having concluded that a reasonable jury could find in favor of the plaintiff regarding the occurrence of a Fourth Amendment violation, the Court will next address whether the Unknown MPD Employees may be held liable. The Court will first analyze whether the

plaintiff has failed to properly implead the Unknown MPD Employees, before turning to whether

the Unknown MPD Employees are entitled to qualified immunity.

### 1.  Failure to Properly Implead

The District argues that "[t]he [p]laintiff's claims [a]gainst the 'Unknown MPD

Employees' [a]re [s]ubject to [d]ismissal" because "[m]ore than three months after the close of

fact discovery, [the p]laintiff has never attempted to amend his Complaint to implead the

'unknown MPD officer' that he accuses of unconstitutionally searching him." Def.'s Mem. at

26.  The plaintiff did not respond to this argument.  See generally Pl.'s Opp'n.  Therefore, the

argument will be treated as conceded.  See Rosenblatt v. Fenty, 734 F. Supp. 2d 21, 22 (D.D.C.

2010) ("[A]n argument in a dispositive motion that the opponent fails to address in an opposition

may be deemed conceded.").

A "[p]laintiff may bring an action against unknown John Doe defendants, but [the]

plaintiff must substitute named defendants for those unknown defendants after the completion of

discovery."  Simmons v. District of Columbia, 750 F. Supp. 2d 43, 45 (D.D.C. 2011); see

Newdow v. Roberts, 603 F.3d 1002, 1010 (D.C. Cir. 2010) ("As a general matter, a court will

not entertain a suit unless the defendant has been made a party by service of process.  Courts do

grant an exception to this rule for 'John Doe' defendants, but only in situations where the

otherwise unavailable identity of the defendant will eventually be made known through

discovery.").  And, if "after the completion of discovery[] [the] plaintiff is unable to substitute

named defendants for the John Doe defendants, the action can no longer proceed against the John

Doe defendants."  Simmons, 750 F. Supp. 2d at 45; see Bloem v. Unknown Dep't of Interior

Emps., 24 F. Supp. 2d 97, 102 (D.D.C. 2014) ("Where a plaintiff fails to timely substitute named

defendants—and, concomitantly, fails to effect service upon them—courts regularly grant

dismissals."). Here, the parties have completed discovery. See Order at 1 (Feb. 25, 2021), ECF No. 55 (indicating a final discovery deadline of April 2, 2021). Moreover, it is evident from the parties' summary judgment briefing that, during the course of discovery, the plaintiff ascertained the name of the transport officer who he alleges violated his constitutional rights—Officer Phillip Harris. See Pl.'s Opp'n at 1, 3, 5–11 (referring to Officer Harris by name); Pl.'s Facts ¶¶ 10, 14, 36–39, 41–46, 48, 63 (same); see also Def.'s Mem. at 27 (stating that during discovery, "the District identified by name the MPD officer that [the p]laintiff accused of conducting the search via its interrogatory responses[,]" and "[the p]laintiff's counsel questioned the District's 30(b)(6) designee about Officer Harris's training record"). However, the plaintiff still has not impleaded Officer Harris by name, and has not indicated why he has not done so, see generally Pl.'s Opp'n. Accordingly, because discovery has concluded and the plaintiff has failed to properly implead the "Unknown MPD Employees" by name as defendants in this action, the Court must dismiss the plaintiff's claims against to the defendant "Unknown MPD Employees." However, as will be discussed, see infra Section III.B.2, even if the plaintiff had properly impleaded the searching officer by name, the Court would still be required to dismiss the plaintiff's claims against the Unknown MPD Employees because these defendants are entitled to qualified immunity.

### 2. Qualified Immunity

The Court also concludes that, even if the plaintiff had properly impleaded the Unknown MPD Employees by name, the Court would still be required to dismiss the claims against these defendants on qualified immunity grounds. The District argues that the individual MPD employees may not be held liable for the plaintiff's alleged Fourth Amendment violation because, even if the plaintiff establishes a constitutional violation, "the MPD transport officer that [the p]laintiff accuses of searching him to determine his anatomical gender . . . would be

entitled to qualified immunity[,]" as "[t]he facts [the p]laintiff relies on [ ] do not describe the violation of a right that was clearly established in August 2017." Def.'s Mem. at 10.  In response, the plaintiff argues that "any reasonable officer would have understood that groping [the plaintiff's] genitals a year after the Dickey decision, whether for the purpose of ascertaining his gender or any other reason without probable cause for the search, was a violation of [the plaintiff's] constitutional rights."  Pl.'s Opp'n at 7.

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine whether a government official is entitled to qualified immunity, the Court must first "decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right[,]" id. at 232 (internal citations omitted), and "[s]econd, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct[,]" id.  For a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987). Furthermore, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011); see id. at 743 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.").  Generally, this means that "in order for the law to be clearly established, there must be a Supreme Court or [ ] Circuit decision on point, or the clearly established weight of authority from other courts must have

16

found the law to be as the plaintiff maintains." Doe v. District of Columbia, 796 F.3d 96, 104 (D.C. Cir. 2015). Ultimately, "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established[,]'" Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting al-Kidd, 563 U.S. at 742) (emphasis in original), and this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition[,]" Brosseau v. Haugen, 543 U.S. 194, 198 (2004). "The proponent of a purported right has the 'burden to show that the particular right in question was clearly established' for qualified-immunity purposes[,]" Daugherty v. Sheer, 891 F.3d 386, 390 (D.C. Cir. 2018) (quoting Dukore v. District of Columbia, 799 F.3d 1137, 1145 (D.C. Cir. 2015)), but the Court must also "draw[] inferences in favor of the non[-]movant, even when . . . [the C]ourt decides only the clearly-established prong of the standard[,]" Tolan v. Cotton, 572 U.S. 650, 657 (2014).

Having determined that the plaintiff has alleged facts which "make out a violation of a constitutional right[,]" Pearson, 555 U.S. at 232; see supra Section III.A, the Court turns to the second step of the qualified immunity inquiry—namely, whether "the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct[,]" Pearson, 555 U.S. at 232. The plaintiff relies on the case Dickey v. United States as a basis for arguing that the MPD officer was on notice that his conduct violated the plaintiff's constitutional rights. See Pl.'s Opp'n at 7 ("[A]ny reasonable officer would have understood that groping [the plaintiff's] genitals a year after the Dickey decision . . . was a violation of [the plaintiff's] constitutional rights."). In Dickey, another member of this Court concluded that the search of the plaintiff in that case was unreasonable because although

> [the officer] was surely entitled to pat [the plaintiff] down before taking him into custody[,] . . . it is not clear that under the circumstances, searching [the plaintiff] a total of six times with two different sets of gloves was necessary or reasonable.

> More importantly, [the plaintiff] alleges that his genitalia were fondled in such a way as to constitute "sexual assault."

174 F. Supp. 3d at 371.  Moreover, the court in Dickey stated that "assuming [the plaintiff's] allegations are true, any reasonable officer would have understood that, at the time [the plaintiff] was taken into custody, repeatedly fondling an individual's genitals incident to their arrest would constitute a violation of that person[']s clearly established constitutional rights."  Id.  In finding that the officers were not entitled to qualified immunity, the court further emphasized that "the true test for qualified immunity in this case is whether, as [the plaintiff] alleges, the law clearly prohibited fondling such that it constituted 'sexual assault.'"  Id. at 371–72.

Here, the plaintiff does not explicitly label the alleged intrusion as "sexual assault."  See generally Compl.; Pl.'s Facts; Pl.'s Opp'n.  However, the plaintiff does allege that the officer "fe[lt] and grop[ed] [the plaintiff's] genitals[,]" Pl.'s Facts ¶ 41; "moved his hand up [the p]laintiff's inner th[i]gh and continued up, thereby touching [the p]laintiff's vagina for about five seconds[,]" id. ¶ 43, "repeated this action . . . one to three more times[,]" id. ¶ 44; and also "pulled back and moved up and down [the p]laintiff's shorts and underwear while [the p]laintiff was facing away from Officer Harris[,]" id. ¶ 45, "d[oing] this three-to-five times for about five seconds each, long enough for Officer Harris to look at [the p]laintiff's bare backside[,]" id. ¶ 46.  The plaintiff also characterizes the experience as having his "genitalia fondled through surface touching" in his opposition.  Pl.'s Opp'n at 7.  Therefore, although the plaintiff does not employ the specific term "sexual assault" as the plaintiff in Dickey did, the conduct alleged by the plaintiff is substantively similar to the conduct alleged in Dickey, see Def.'s Facts ¶ 2; Pl.'s Facts at 1.  Compare Pl.'s Facts ¶¶ 41, 43–46, with Dickey, 174 F. Supp. 3d at 371 (describing the officer's conduct as "repeatedly fondling [the plaintiff's] genitals"), and a reasonable jury could conclude that the repeated "groping[,]" Pl.'s Facts ¶ 41, and "fondl[ing,]" Pl.'s Opp'n at 7, that

the plaintiff experienced constituted "sexual assault[,]" <u>Dickey</u>, 174 F. Supp. 3d at 371.  <u>See</u>

<u>Anderson</u>, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment[.]").

       However, the Court's inquiry does not end there.  Although, generally speaking, the

Court agrees that a "reasonable officer [sh]ould have understood that, at the time [the plaintiff]

was taken into custody, repeatedly fondling an individual's genitals incident to their arrest would

constitute a violation of that person[']s . . . [Fourth Amendment] rights[,]" <u>Dickey</u>, 174 F. Supp.

3d at 371, it is not accurate to say that this is the "true test for qualified immunity[,]" <u>id.</u> at 371–

72.  Rather, the right at issue must be clearly established and, "in order for the law to be clearly

established, there must be a Supreme Court or [ ] Circuit decision on point[.]"  <u>Doe</u>, 796 F.3d at

104.  The Court has identified no Supreme Court or Circuit precedent establishing that sexual

assault committed by a police officer violates the Fourth Amendment.  Nor has the Court

determined that "the clearly established weight of authority from other courts [supports the

conclusion that] the law [is] as the plaintiff maintains."[6]  <u>Id.</u>  Therefore, "existing precedent [has

not] placed th[is] . . . constitutional question beyond debate[,]" <u>al-Kidd</u>, 563 U.S. at 741, and the

Court must therefore conclude that, although a reasonable jury could conclude that a Fourth

---

[6] The United States Court of Appeals for the Eighth Circuit has established that sexual assault against an arrestee violates a clearly established right under the "substantive due process right to bodily integrity[.]"  <u>Johnson v. Phillips</u>, 664 F.3d 232, 239 (8th Cir. 2011); <u>Rogers v. City of Little Rock, Ark.</u>, 152 F.3d 790, 795 (8th Cir. 1998). However, the Eighth Circuit has not reached this conclusion in the Fourth Amendment context, and even if it had, the precedent of one circuit is clearly not enough to constitute "the clearly established weight of authority from other courts[.]"  <u>Doe</u>, 796 F.3d at 104.

Amendment violation occurred in this case, see supra Section III.A, the Unknown MPD Employees are entitled to qualified immunity regarding that violation and cannot be held liable.[7]

## C.     Whether the District of Columbia May Be Held Liable

The District of Columbia argues that it cannot not be held liable for any Fourth Amendment violation in this case because "[the plaintiff] has no evidence that a District 'custom, policy, or practice' caused him to suffer a constitutional deprivation." Def.'s Mem. at 17. Specifically, the defendant argues that (1) "the District had an [a]ctual [p]olicy of [n]on-[d]iscrimination[,]" id. at 18 (emphasis added); (2) "[the p]laintiff [c]annot [e]stablish that a [m]unicipal '[c]ustom' existed[,]" id. at 20; and (3) "[the p]laintiff has no [e]vidence to [s]upport a [f]ailure to [t]rain [c]laim[,]" id. at 23. In response, the plaintiff only addresses the defendant's failure to train argument, stating that "[i]n this case, a jury could easily conclude that one instance of 'training' by a slide show that includes only one brief reference on MPD's policy prohibiting the searching of transgender detainees to ascertain their gender is insufficient." Pl.'s Opp'n at 8. Accordingly, the Court will treat the defendant's arguments regarding the absence of a municipal policy or custom, see Def.'s Mem. at 18, 20, as conceded, see Rosenblatt, 734 F. Supp. 2d at 22 ("[A]n argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded."), and only consider whether the defendant "fail[ed] to provide training to [MPD] employees[,] . . . [thus] yield[ing] liability against the municipality[,]" City of Canton, Ohio v. Harris, 489 U.S. 378, 392 (1989).

---

[7] Because the Court ultimately finds that the plaintiff failed to properly implead the Unknown MPD Employees, see supra Section III.B.1, and the appropriate action for the Court to take in this context is the dismissal of the non-impleaded defendants as opposed to entry of summary judgment, see Simmons v. District of Columbia, 750 F. Supp. 2d 43, 45 (D.D.C. 2011), the Court will not enter summary judgment for the defendant as to the Unknown MPD Employees, but rather will dismiss them as defendants.

Generally speaking, "a municipality cannot be held liable <u>solely</u> because it employs a

tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a <u>respondeat</u>

<u>superior</u> theory." <u>Monell v. Dep't of Social Servs. of the City of New York</u>, 436 U.S. 658, 691

(1978) (emphasis in original).  And, "[i]t is [only] when execution of a government's policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury that the government as an entity is responsible under

§ 1983." <u>Id.</u> at 694.  Moreover, a plaintiff may establish municipal liability based upon a

municipal defendant's failure to train its employees, but "[o]nly where a failure to train reflects a

'deliberate' or 'conscious' choice by the municipality can the failure be properly thought of as an

actionable city 'policy.'" <u>City of Canton, Ohio</u>, 489 U.S. at 379.  "A municipality's culpability

for a deprivation of rights is at its most tenuous where a claim turns on a failure to train[,]"

<u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011), and the municipality's failure to train "must

amount to 'deliberate indifference to the rights of persons with whom the [untrained employees]

come into contact.'" <u>Id.</u> (quoting <u>City of Canton, Ohio</u>, 489 U.S. at 388) (alteration in original);

<u>see</u> <u>Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown</u>, 520 U.S. 397, 410 (1997)

("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal

actor disregarded a known or obvious consequence of his action."); <u>Parker v. District of</u>

<u>Columbia</u>, 850 F.2d 708, 712 (D.C. Cir. 1988) ("[L]iability may be found under <u>Monell</u> when

there is evidence of deliberate indifference manifest by systemic and grossly inadequate training,

discipline, and supervision.").  A failure-to-train analysis "concern[s] [ ] the substance of the

training, not the particular instructional format[, and § 1983] does not provide plaintiffs or courts

<u>carte blanche</u> to micromanage local governments[.]" <u>Connick</u>, 563 U.S. at 68.  "[S]howing

merely that additional training would have been helpful in making difficult decisions does not

establish municipal liability[,]" id.—in other words, "[p]rov[ing] that an injury or accident could

have been avoided if an [employee] had had better or more training, sufficient to equip him to

avoid a particular injury-causing conduct' will not suffice[,]" id. (quoting City of Canton, Ohio,

489 U.S. at 391) (second and third alterations in original).

Regarding the training conducted by the MPD in this case, the parties agree that the MPD

has a policy, revised and adopted in 2015, which states that "[u]nder no circumstances shall

members search any person solely for the purpose of determining the person's gender." Pl.'s

Facts ¶ 65; Def.'s Resp. to Pl.'s Facts ¶ 65. The parties also agree that, "[i]n 2015, [the] MPD

held a four-hour training block[,]" Def.'s Facts ¶ 23, which covered issues related to the

treatment of lesbian, gay, bisexual, and transgender ("LGBT") individuals to some extent. See

id.; Pl.'s Facts ¶ 23. However, they dispute the extent and nature of the presentation's instruction

regarding police interactions with transgender individuals. Compare Def.'s Facts ¶ 23

(characterizing the training as "a four-hour training block for interacting with transgender

persons that all officers and sergeants were required to attend"), with Pl.'s Facts ¶ 23

(characterizing the training as "not on 'interacting with transgender persons[,]'" but "generally

about 'LGBT issues and bias-related crimes'"). The plaintiff specifically states that, in the

relevant slideshow presentation, "[o]f the one hundred slides presented, only one slide had any

reference to MPD's policy forbidding the searching [of] persons for the purpose of determining

that person's gender[,]" Pl.'s Facts ¶ 67, while the defendant states that "[t]wo slides regarding

transgender searches were included in the presentation[,]" Def.'s Resp. to Pl.'s Facts ¶ 67

(emphasis in original). Additionally, the parties agree that there was information conveyed in

some form entitled "Handling Interactions with Transgender Individuals[,]" Def.'s Facts ¶ 24;

Pl.'s Facts ¶ 24, but disagree as to the format of this information and the extent to which it was

circulated, compare Def.'s Facts ¶ 24 ("In 2014–2017, MPD offered an annual training module to all MPD [o]fficers called 'Handling Interactions with Transgender Individuals.'"), with Pl.'s Facts ¶ 24 ("The materials identified by [the d]efendant are not training modules.  They are roll call reminders, which are one-page written documents that the roll call sergeants would read to the room.  Moreover, the roll call reminder titled 'Handling Interactions with Transgender Individuals' only occurred during roll calls in January 2014, not an annual basis from 2014– 2017.").

As a preliminary matter, although the defendant argues that "[a]ll MPD officers are expected to be familiar with MPD General Orders, including 'Handling Interactions with Transgender Individuals[,]'" Def.'s Mem. at 24, the existence of a written policy is not enough to defeat a failure-to-train claim.  See Matthews v. District of Columbia, 730 F. Supp. 2d 33, 37–38 (D.D.C. 2010) (imposing municipal liability based in part upon a failure to train, despite the existence of a written policy against the alleged conduct); Thomas v. District of Columbia, 887 F. Supp. 1, 5 (D.D.C. 1995) ("The District of Columbia is not off the hook merely because regulations exist.").  However, the plaintiff's arguments that the defendant failed to provide appropriate training constitute criticisms of the adequacy of existing training, rather than allegations regarding the substance of the training which would amount to "deliberate indifference."  See Connick, 563 U.S. at 68 ("[P]roving that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid a particular injury-causing conduct' will not suffice.") (quoting City of Canton, Ohio, 489 U.S. at 391) (alterations in original).  It is undisputed that the MPD conducted a four-hour training block in 2015, much of which covered LGBT issues.  See Def.'s Facts ¶ 23; Pl.'s Facts ¶ 23.  A review of the slideshow shows that a substantial portion of the presentation focused on police treatment

of transgender individuals, see Pl.'s Ex. G (LGBT Issues, Bias Related Crimes, Intimate Partner

Violence: 2015 Professional Development Training ("2015 Training")) at 1–41, ECF No. 66-1,

and two slides explicitly state the MPD policy against searching transgender individuals to

ascertain gender, see id. at 28–29.  Additionally, although the parties dispute whether they

constitute "training modules[,]" Def.'s Facts ¶ 24, or "roll calls[,]" Pl.'s Facts ¶ 24, MPD officers

were provided with some annual training regarding interactions with transgender individuals

between 2014–2016, see Def.'s Mot., Ex. 8 (January 2014 Daily Training Calendar), ECF No.

62-1; id., Ex. 9 (February 2015 Daily Training Calendar), ECF No. 62-1; id., Ex. 10 (March

2016 Daily Training Calendar), ECF No. 62-1.

Based on the record, the defendant has provided MPD employees with training regarding

interacting with transgender individuals.  And, to the extent that the plaintiff takes issue with the

quality and frequency of the training, the Court concludes that the plaintiff's allegations do not

rise to the level of "deliberate indifference manifest by systemic and grossly inadequate

training[,]" Parker, 850 F.2d at 712; see, e.g., id. at 713 (finding deliberate indifference where

"the officers' training regarding [the conduct at issue] consisted of a single memo" which "failed

to cover the circumstances they would confront[,]" and the officer whose conduct was being

challenged had not received relevant training for four years prior to the conduct); Thomas, 887 F.

Supp. at 6 (stating that "[t]he absence of proper supervision, training[,] and discipline . . . may

demonstrate deliberate indifference" (emphasis added)), given that "[§ 1983] does not provide

plaintiffs or courts carte blanche to micromanage local governments," Connick, 563 U.S. at 68,

and "showing merely that additional training would have been helpful in making difficult

decisions does not establish municipal liability[,]" id.  Therefore, the Court concludes that, even

accepting the plaintiff's allegations as true, a reasonable jury could not find the defendant

District of Columbia liable for any underlying Fourth Amendment violation in this case based upon a failure to train.  Accordingly, the Court must grant the defendant's motion for summary judgment as to the plaintiff's claims against District of Columbia.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part the defendant's motion for summary judgment.

**SO ORDERED** this 4th day of November, 2022.[8]

REGGIE B. WALTON
United States District Judge

---

[8] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.